◆AO91 (Rev. 10/03) Criminal Complaint

# UNITED STATES DISTRICT COURT

_____ SOUTHERN _____ DISTRICT OF _____ TEXAS _____

| | |
|---|---|
| UNITED STATES OF AMERICA<br>V.<br><br>Hugo Ortiz, Sanotos Diaz-Soto, Marcela Osorio-Pemberthy, Brian Blanco, Juan Carlos Valencia and Gabriel Ocampo-Mayorquin<br><br>(Name and Address of Defendant) | **CRIMINAL COMPLAINT**<br><br>Case Number: H-09-814M |

*unSealed*
*Public and unofficial staff access to this instrument are prohibited by court order.*

I, the undersigned complainant, state that the following is true and correct to the best of my knowledge and belief. On or about  September 11, 2009  in _____ Harris _____ County, in
                                                                    (Date)
the Southern District of Texas defendant(s) did,

*(Track Statutory Language of Offense)*

conspire with one another and other persons known and unknown, to unlawfully obstruct, delay, and affect, and attempt to obstruct, delay and affect, commerce as defined in Title 18, by United States Code, Section 1951, and the movement of articles and commodities in such commerce, by robbery,


in violation of Title  18  United States Code, Section(s)  1951(a)  .

I further state that I am a(n)  employed by the Houston P.D.  and that this complaint is based on the
                                                 Official Title
facts related in the affidavit attached hereto and made a part of this complaint.

_____
Signature of Complainant

Peter Schneider
Printed Name of Complainant

Sworn to before me and signed in my presence,

October 13, 2009                                          at     Houston, Texas
Date                                                                    City and State

Stephen W. Smith, United States Magistrate Judge                 _____
Name and Title of Judicial Officer                                     Signature of Judicial Officer

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS

IN THE MATTER OF THE APPLICATION        )
OF THE UNITED STATES OF AMERICA         )
FOR A CRIMINAL COMPLAINT                )

## AFFIDAVIT

I, Peter Schneider, a Houston Police Officer with the City of Houston, hereinafter referred to as Affiant, being duly sworn, do depose and state that:

A. EXPERIENCE AND TRAINING

(1) Affiant P.J. Schneider is a Sergeant with the Houston Police Department, currently assigned to the Federal Bureau of Investigation's (FBI) Houston Violent Crimes Task Force (HVCTF). Affiant is a Texas Peace Officer and has been a police officer for approximately 31 years and is experienced in conducting criminal investigations and executing arrest warrants. The following statements are based on the affiant's personal knowledge or information relating by other credible and reliable persons.

(2) The Houston Violent Crimes Task Force (HVCTF) is charged with investigating crimes against jewelry salesmen who travel interstate to sell their lines of jewelry. These armed robberies are committed in violation of the Hobbs Act and involve armed suspects using weapons,

- 1 -

violence, threats and intimidation to facilitate the commission of these offenses. These suspects when arrested will assume new identities in order to escape stricter prosecution of their cases and to receive lower bond settings in order to be able to be released from jail. The vast majorities of these suspects are Colombian nationals and are residing in the United States in violation of United States Laws. When arrested, the suspects will deny their true nationalities and will either attempt to masquerade as United States citizens or as citizens of Mexico where illegal reentry back into the United States is easier.

(3) During the course of my participation in investigations of various criminal enterprise organizations, I have testified in Grand Jury proceedings and at trial. I have written reports, analyzed records and documents, and prepared affidavits for pen registers, search warrants and arrest warrants. Through my assignment with the FBI, I have gained knowledge in the use of various investigative techniques including the utilization of physical surveillance, undercover agents, confidential informants and cooperating witnesses, electronic surveillance, consensually monitored recordings, investigative interviews, trash covers, mail covers, financial investigations, the service of Administrative and Grand Jury Subpoenas, and the execution of search and arrest warrants. I am currently assigned to Safe Streets and Violent Crimes Task Force in

the Houston Field Office, and have been so assigned since March 1999. I am familiar with the FBI's Domestic Investigations and Operations Guide pertaining to the investigation of Interference with Commerce by Threats of Violence, and the elements needed to prove such crimes.

B.  INTRODUCTION

(4) I have personally participated in this investigation and am familiar with the information contained in this affidavit either through personal investigation, debriefings with the Cooperating Witness or through discussions with other law enforcement personnel. The following information is derived from the collection of evidence, physical surveillance, consensual searches, interviews of witnesses and victims, and interrogations of subjects having knowledge of the events described herein. All facts set forth below are true and correct to the best of my knowledge. Affiant has identified the witnesses to this offense using initials to conceal their identities from the subjects who are known to be violent and to retaliate against persons who testify against them.

C.  SPECIFIC FACTS

(5) On September 11, 2009, at approximately 3:30 p.m., six subjects tried to rob JOSEPH NOVOSEL at gunpoint, at the Hilton Inn located at 3201 Sage Road, Houston Texas (Galleria District). NOVOSEL was a traveling jewelry

salesman for the MOVADO GROUP, and had traveled Interstate from Louisiana to Houston, to show MOVADO watches to owners and managers of jewelry stores in Houston. These watches had been sent to NOVOSEL from the MOVADO GROUP in New Jersey. NOVOSEL had been robbed of his jewelry line twice before in Houston, and due to this hazard he decided on this trip to hire a Texas Peace Officer to act as his security guard. Officer MICHAEL SEHON of the Texas Alcohol Beverage Commission (TABC) was working as the security guard for NOVOSEL, and was waiting for NOVOSEL in the rental car outside of a hotel, when two Hispanic men, in hooded shirts with their faces obscured, approached and began to rob SEHON at gunpoint. The two subjects were later identified as GABRIEL OCAMPO-MAYORQUIN, aka "G.O." and SANTOS SOTO-DIAZ, aka JAISON A. DURAN MEJIA. OCAMPO broke the driver's side windows of the rental car with a punch while DIAZ held a loaded gun to SEHON'S face and demanded the jewelry.

(6) SEHON drew his weapon and fired eight to nine rounds at the two assailants. DIAZ was shot three times in the back and arms, causing him to drop the handgun at the scene. OCAMPO was believed to be shot in the arm as he ran away. Immediately after the robbery, three suspicious vehicles were seen to enter The Gables Apartments located at 3300 Sage Road, where witness AS and three other witnesses, CC, DH and MT observed the three vehicles enter the parking lot at a high rate of speed. The vehicles were

described as a green Acura sedan, red Chevy SUV and a black Toyota Sequoia. These employees took down the partial and full license plates of all three vehicles. The partial license plate on the black Toyota Sequoia was VJS-53, the full plate on the green Acura was TGC360 and the plate on the maroon SUV was recorded as 861VJ27.

(7) Houston Homicide Investigator David Gunter later showed photo spreads to these witnesses, who had seen the three suspicious cars drive into the parking lot of the Gables Apartments. These photo spreads were of suspects, who were identified during the investigation as having been involved in the offense. The Gables apartments are located across the street from the scene of the robbery and the vehicles were seen driving into the back parking lot of the Gables Apartments a block from the scene of the robbery. Witness AS stated a large Hispanic male with a Mohawk (BLANCO at the time of his arrest was a large Hispanic male with a Mohawk) got out of the black Sequoia. AS saw this male walk back to the rear of the green Acura and pull a paper license plate off of it and throw it on the ground. Affiant knows from his experience in investigating these types of robberies, the suspects will use paper plates to conceal the real identity of the robbery vehicle. Witness AS identified PEMBERTHY as driving the green Acura, and another Hispanic male was driving the maroon SUV which had new Texas plates on it. AS identified ORTIZ as being in the group of subjects who occupied the cars in the parking

lot. AS saw a male, who was bleeding, get into the black Sequoia. Affiant believes this male to be DIAZ based on DIAZ'S later statement and the wounds he suffered.

(8) Witness CC identified BLANCO and OCAMPO as being occupants of the vehicles. OC saw BLANCO get out of the Sequoia and pull the paper plate off of the green car. He had a surgical glove on his hand. Witness stated a male who was bleeding got out of the green car and got into the Sequoia. CC stated a female got out of the maroon car, got into the green car and drove it off.

(9) Witness MT identified suspect BLANCO. MT stated BLANCO got out of the Sequoia and there was a bleeding male who got out of the green car.

(10) Witness DH identified PEMBERTHY and stated PEMBERTHY was in the maroon SUV and got into the green Acura and drove it off. DH stated a male, who was bleeding, got out of the green Acura and into the black SUV. DH saw a Hispanic male with a Mohawk exit the black Sequoia and walk to the green Acura and pull the paper plate off of it.

(11) Houston Police Homicide Detectives (HPD) arrived at the scene of the robbery and processed the scene. A Glock pistol and a metal punch were recovered from the scene and are believed to have been used by the subjects during the robbery. Subsequent leads led to a gunshot victim, who was dropped off at Herman Memorial Hospital Southwest, by a Hispanic male driving a black Toyota Sequoia. ORTIZ later admitted during his interview with

the police, to having driven the Toyota Sequoia to the hospital and dropping DIAZ off at the emergency room.

(12) Investigators responded to the hospital and identified SANTOS DIAZ-SOTO, DOB 08/25/1986, as the Hispanic male with multiple gunshot wounds to the back and arms. DIAZ identified some of his fellow robbers from photo spreads shown to him on the first and subsequent interviews as HUGO BEETHOVAN ORTIZ, MARCELA OSORIO PEMBERTHY and BRYAN IVAN BLANCO.

(13) DIAZ proclaimed to be Puerto Rican and stated he had received a call from BLANCO who told him "GORDO", a male later identified as JUAN CARLOS VALENCIA had something for them to do. DIAZ stated he, BLANCO, ORTIZ, PEMBERTHY and "NEW YORK/GO", a male later identified as GABRIEL OCAMPO-MAYORQUIN, met with VALENCIA in a parking lot and planned the robbery. VALENCIA told DIAZ he was to break the car window and get the jewelry. DIAZ was to receive $5000.00 for doing the robbery. DIAZ said VALENCIA told him that he had been following the jeweler and the jeweler had approximately $500,000.00 in product in his vehicle. VALENCIA provided the gun which was used to commit the robbery. DIAZ stated BLANCO was acting as the lookout for the robbery.

(14) DIAZ said he got into VALENCIA'S maroon SUV with VALENCIA and OCAMPO-MAYORQUIN to go do the robbery. He stated VALENCIA was driving and stopped just south of the hotel where the robbery occurred and let DIAZ and OCAMPO

out. DIAZ got out of the car with OCAMPO and approached the victim's car. VALENCIA drove just north of the robbery location and pulled over. DIAZ stated OCAMPO had a pistol and he had a punch. They approached the driver's side of the jeweler's car. DIAZ said when he broke the window he heard several gun shots. DIAZ stated OCAMPO was pointing the pistol at SEHON.

(15) DIAZ stated while they were committing the robbery, PEMBERTHY drove up to where VALENCIA was parked in a dark green car and got out and switched cars with VALENCIA. DIAZ stated VALENCIA got into the green car and PEMBERTHY got into SUV. When the shooting started he and OCAMPO ran to the Acura which VALENCIA was now driving and drove off. DIAZ said they drove to an apartment complex parking lot and he got into ORTIZ's black SUV and OCAMPO got into the red SUV. DIAZ stated ORTIZ drove him to the hospital.

(16) On 09/14/2009, SA AGUILAR began checking locations where the robbery suspects may have been located. He found a Sequoia with Texas license plate number VJS-534. The Sequoia was parked in the vicinity of 13135 High Star, Houston Texas. Officers began to watch the Sequoia to see if the suspects would return to it.

(17) At approximately 4:00 p.m. on 09/14/2009, a red sedan drove up to the Sequoia. PEMBERTHY got out of the red car and walked up to the black Sequoia and got into it

and drove off. ORTIZ and a male identified as JONATHAN ALTAMIRANO-ARENAS stayed in the red car. ALTAMIRANO was driving the red car and ORTIZ was the passenger. Both cars appeared to be headed to a nearby carwash, but once they saw the marked units, they tried to evade the police cars. Both vehicles were subsequently stopped. Officers observed that the left rear seat and left rear door of the Sequoia were covered in blood.

(18) During ALTAMIRANO's interview, he stated ORTIZ and PEMBERTHY told him they participated in a robbery that led to DIAZ getting shot in the back. He stated that ORTIZ and PEMBERTHY were hiding out at a hotel off of Highway 6 and that he drove them to pick up the Sequoia that was used during the robbery, and that it was covered in DIAZ's blood.

(19) PEMERTHY was interviewed and after several hours of denying her involvement, she acknowledged that see saw there was blood in the back seat and she was headed to clean the blood from the vehicle at the time of her arrest. PEMBERTHY even had a parking ticket in her purse from the Herman Memorial Hospital parking garage where the Sequoia had been dropped off. She also acknowledged she was driving a green car on the day of the robbery. After several hours of denying her involvement, PEMBERTHY requested an attorney, at that time all questioning stopped.

(20) ORTIZ was also advised of his Rights and voluntarily provided a statement and denied having any

knowledge of any robbery, but admitted to driving the Sequoia at approximately 4:00 p.m. on the day of the robbery in the vicinity of Westheimer near the Galleria. ORTIZ stated that "the owner of the Sequoia" called him on his cell phone and asked ORTIZ to pick up one of their friends who had been shot in the Galleria Area. ORTIZ said he drove to a parking lot in the Galleria area and saw that DIAZ had been shot. ORTIZ stopped the Sequoia and DIAZ crawled into the back seat and then ORTIZ drove DIAZ to a local hospital, where ORTIZ dropped DIAZ off at the emergency room. ORTIZ further admitted to leaving the Sequoia in the parking lot and walking several blocks before getting picked up by one of his "friends." ORTIZ mentioned that he, ALTAMIRANO and PEMBERTHY were on their way to the car wash to clean the blood out of the Sequoia, at the time they were arrested.

(21) On 09/16/2009, BRYAN IVAN BLANCO was arrested for his participation in the robbery, by the HPD based on DIAZ's statements that BLANCO was a lookout during the robbery and was driving a dark colored Acura. DIAZ also stated that BLANCO had trained him, prior to the robbery on how to assault the jeweler's vehicle, break out the glass, punch out the tires and steal the jewelry in a matter of seconds.

(22) BLANCO voluntarily gave a detailed statement to the HPD about the robbery, as to who were the participants,

who were the injured subjects and what vehicles were used. BLANCO further advised that he learned all these details from "LUCIANO," while they were at the Willow Brook Mall. BLANCO insisted that he was not involved in the robbery and that there were only five subjects involved and not six. On 09/17/2009, BLANCO was interviewed by SA AGUILAR and advised of his rights to which he understood and then voluntarily provided additional statements. During BLANCO's interrogation, he again denied any involvement in the robbery, but admitted to knowing that ORTIZ, PEMBERTHY, DIAZ and two others known to him as "CACHETES/GORDO" (Cheeks/Fat Boy) (JUAN CARLOS VALENCIA) and "G.O." (GABRIEL OCAMPO-MAYORQUIN) as being involved in the robbery.

(23) SA AGUILAR asked BLANCO if HPD had shown him any photo spreads of subjects involved in the robbery. BLANCO indicated that he had seen several photo spreads and positively identified HUGO B. ORTIZ; MARCELA OSORIO PEMBERTHY; SANTOS SOTO DIAZ, aka JAISON A. DURAN MEJIA and JUAN CARLOS VALENCIA's, aka "CACHETON/GORDO," from the photo spreads as having committed the robbery. BLANCO also gave consent to review his cell phone and cellular numbers for ORTIZ and G.O. (OCAMPO) were located. BLANCO claimed to be at the Willow Brook Mall around 12:00 p.m. the day of the robbery, but could not account for his exact location at the time of the robbery, which took place between 3:30 - 4:00 p.m. BLANCO also advised that he saw OCAMPO on

09/12/2009, at approximately 4:00 p.m., at the McDonald's parking lot in the vicinity of Highway 6 and Bellaire. OCAMPO had a bandage from his elbow down to his hand and was headed to Mexico for medical treatment.

(24)  On 09/17/2009, SA AGUILAR accompanied SA GLEN ARNOLD, from Immigration and Customs Enforcement, to visit DIAZ at the hospital.  DIAZ continued to claim that he was born in Puerto Rico, left at the age of three, moved to New York and then to Atlanta, Georgia.  SA ARNOLD showed SA AGUILAR an immigration document with DIAZ's photo on it.  SA AGUILAR recognized DIAZ in the photo.  The name on the immigration file was JAISON A. DURAN MEJIA, DOB 08/25/1986, with an FBI# of 637989WB7 and an Alien # of A-075220647.

(25)  On 09/23/2009, Witness HC was interviewed about what he knew about a Colombian Theft ring robbing a jeweler where two of the subjects were shot.  HC was aware of the robbery from ORTIZ and his girlfriend PEMBERTHY.  He stated on 09/11/2009, at approximately 9:00 p.m., ORTIZ and PEMBERTHY arrived at HC's residence and began using HC'S computer to search the internet to find local news information about the robbery.  During their search, ORTIZ made a comment that he took one of the gunshot victims, from the robbery, to the hospital of Highway 59 and Bissonnet.  PEMBERTHY also made a comment that she was driving a red SUV during the robbery.  ORTIZ and PEMBERTHY were visibly concerned and stressed over the shooting

incident and were hiding out at hotel and desperately seeking money to leave the country.

(26) HC further advised that at midnight on 09/13/2009, ORTIZ, PEMBERTHY, ALTAMIRANO and VALENCIA arrived at HC'S house and asked for his assistance to go retrieve the a black Sequoia from the hospital. HC agreed and drove ORTIZ and PEMBERTHY to Herman Memorial Southwest, while ALTAMIRANO and VALENCIA followed in ALTAMIRANO's red Camry. Upon arriving at the hospital, HC noticed blood stains on the front and back passenger doors of the Sequoia. ORTIZ then got into the Sequoia and they all returned to HC'S residence. ORTIZ left the Sequoia in a nearby parking space next to HC'S residence. HC confronted ORTIZ about leaving the Sequoia there, because of concern about the police finding it. ORTIZ didn't listen and left the Sequoia parked there anyway.

(27) HC further advised that VALENCIA took a jacket or shirt and some gloves stained with blood and asked HC if he could burn the items in HC'S backyard. HC said no, then went and got a white plastic trash bag for VALENCIA to place the articles into, so he take them with him. VALENCIA placed the items into the plastic bag and went into HC'S back yard and burned the items next to a tree. HC took SA AGUILAR to his residence where the items were burnt and SA AGUILAR took photographs and collected pieces

of burnt clothing and ashes to corroborate HC'S story. SA AGUILAR showed photo spreads of Hispanic men to HC and positively identified VALENCIA as being the one who burned the clothing. HC was also of the belief that VALENCIA was the ring leader of the robbery team and the most violent one of them all.

(28) Affiant therefore believes there is sufficient evidence to show probable cause that HUGO B. ORTIZ, SANTOS DIAZ-SOTO (aka JAISON A. DURAN-MEJIA), MARCELA OSORIO-PEMBERTHY, BRYAN IVAN BLANCO, JUAN CARLOS VALENCIA and GABRIEL OCAMPO-MAYORQUIN violated and conspired to violate offenses enumerated under Title 18, United States Code, Section 1951(a).

_____
Peter Schneider
Task Force Officer
Houston Police Department
Houston, Texas

Subscriber and sworn before me this 13th day of October, 2009. and I find probable cause.

_____
U.S. Magistrate Judge

- 14 -